UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
RED MOUNTAIN MEDICAL HOLDINGS, INC.
f/k/a CDx DIAGNOSTICS, INC.,

               Plaintiff,

         - against -

JOEL V. BRILL, M.D. and PREDICTIVE
HEALTH, LLC,

               Defendants.
-----------------------------------X

20 Civ. 2652 (NRB)

**MEMORANDUM & ORDER**

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


    This case arises out of two failed financing deals between plaintiff Red Mountain Medical Holdings ("Red Mountain") and potential investors to help fund Red Mountain's esophageal cancer detection technology.  In both instances, the investors hired defendant Dr. Joel Brill either directly or through his consulting company, defendant Predictive Health, LLC, to perform due diligence on Red Mountain.  Unbeknownst to Red Mountain or the investors, Brill was working for Red Mountain's direct competitors at the time to help them establish their technology as the industry standard.  According to Red Mountain, Brill falsely claimed to be conflict free to secure his role as an adviser in the due diligence process and then used that role to scare off

potential investors by dishonestly advising them that Red Mountain had been employing fraudulent billing practices.

This case was originally filed in the Supreme Court of the State of New York, County of New York, on December 13, 2019 and was properly removed on March 30, 2020.  On September 24, 2020, Red Mountain filed the operative First Amended Complaint ("FAC" or "Complaint" (ECF No. 22)) asserting claims against defendants for (1) breach of contract, (2) fraud, (3) constructive fraud, (4) tortious interference with prospective business advantage, (5) tortious interference with contract, and (6) unfair competition.

Defendants now move to dismiss the Complaint in its entirety.  (ECF No. 29.)  Oral argument was held on defendants' motion on September 3, 2021.  For the reasons below, defendants' motion is granted in part and denied in part.

## BACKGROUND[1]

Red Mountain is a medical technology company that developed a diagnostic tool called Wide Area Transepithelial Sampling with 3D Computer Assisted Tissue Analysis ("WATS3D")

---

[1]     The following summary is taken from factual allegations contained in the Complaint and the documents incorporated by reference, including the two contracts underlying Red Mountain's breach of contract claim (ECF Nos. 31-1, 31-2).

that can detect esophageal adenocarcinoma ("AEC") cancer in its early stages.

At all times relevant to this lawsuit, Red Mountain, along with its competitors, Mauna Kea and NinePoint Medical (together, the "Competitors"), were the three companies vying to establish their respective technologies as the industry standard for early AEC detection.  Because of limitations in the medical reimbursement system, only one of these technological approaches could be designated as the official standard of care adopted by the American Society of Gastrointestinal Endoscopy Standard of Practice Guideline (the "Guideline").  In effect, this created a zero-sum competition between Red Mountain and its Competitors.

By January 2015, Red Mountain needed to secure funding from investors to repay its debt and to further develop its WATS3D technology by financing the clinical trials that were necessary to bring the technology to market.  That month, the company began talks with Kohlberg Kravis Roberts & Co. ("KKR"), a prominent private equity firm, about a potential investment in Red Mountain.  After their negotiations, KKR and Red Mountain signed a preliminary term sheet on May 18, 2015, which valued Red Mountain at $125 million following KKR's anticipated investment of $35 million.  While the term sheet's funding provisions were preliminary and non-binding,

other aspects of the contract, such as its confidentiality and use-of-information terms, were binding and enforceable. The term sheet also contained a limited exclusivity period that prevented Red Mountain from exploring other financing options.  Before finalizing the transaction, KKR informed Red Mountain that it would hire an independent consultant to perform confirmatory due diligence on Red Mountain's coding and billing practices.

In May 2015, KKR hired Brill, an expert in coding and reimbursement of claims for gastrointestinal procedures, as its independent contractor to perform the due diligence of Red Mountain and other potential investment targets.  At the time he was hired, Brill represented to KKR that he did not have any conflict of interest that would interfere with his assessment of Red Mountain and signed an agreement with KKR not to disclose confidential information he received in the course of his assessment.  KKR, in turn, assured Red Mountain that its independent consultant had no conflicts of interest and had signed a non-disclosure agreement.  Based on these representations, Red Mountain agreed to go forward with the due diligence process involving Brill.

After reviewing Red Mountain's information, Brill advised KKR in November and December 2015 that Red Mountain had improperly been using a billing code with a higher

reimbursement rate for one of the laboratory services it routinely performed and, consequently, Red Mountain might eventually face penalties and have to repay millions of dollars in Medicare reimbursements and other payments it received.  Red Mountain attempted to assuage KKR's concerns about overbilling, including providing KKR with the opinions of other experts who specialized in billing for these types of medical procedures.  However, in December 2015, KKR informed Red Mountain that it was not ready to invest because of the reimbursement concerns raised by Brill.  KKR also told Red Mountain that were it not for these concerns, it would have closed the deal with Red Mountain months earlier.  While Red Mountain continued to try to persuade KKR to follow through on the proposed financing deal throughout 2016 and 2017, these efforts were fruitless.

With no KKR deal in place, Red Mountain began exploring other sources of financial investments.  In November 2016, it entered into a proposed term sheet with an investment company called Accelmed Growth Partners that valued Red Mountain at $100 million following Accelmed's anticipated investment.  As with KKR, Accelmed hired Brill, through his company Predictive Health, as its independent consultant to perform due diligence on Red Mountain.  In the consulting agreement with Accelmed, Brill agreed to maintain the confidentiality

of non-public information he received during his evaluation. Brill also certified that he had no conflicts that would prevent him from performing his contractual duties for Accelmed.

As before, Brill advised Accelmed that Red Mountain was using fraudulent billing practices.  And, in December 2016, Accelmed informed Red Mountain that it was not going to invest in the company.

By 2017, Red Mountain's creditors threatened to put the company into bankruptcy.  Given the exigencies of the situation, Red Mountain entered into a financing agreement with the private equity company Galen Management, Inc. in July 2017 that valued Red Mountain at $57 million following Galen's anticipated investment.  Unlike the contemplated KKR and Accelmed financing deals, this investment, inter alia, required Red Mountain to give Galen a majority stake in the company.  With financing secured, Red Mountain was able to successfully launch the WATS3D technology, and it became the official standard of care endorsed in the Guideline in 2019.

At some point in 2018, after the financing deal with Galen was completed, Red Mountain discovered that Brill had been working with the Competitors between 2015 and 2017 at the same time that he was advising KKR and Accelmed on their potential investments in Red Mountain.  The Competitors had

combined their resources and hired Brill to petition the American Medical Association to create a unique billing code for the Competitors' technology and to convince the Center for Medicare Services to agree to reimburse the new billing code at a profitable rate.

## LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In assessing the sufficiency of a complaint, we "accept[] as true all factual allegations in the complaint, and draw[] all reasonable inferences in the plaintiff's favor." Barrows v. Burwell, 777 F.3d 106, 111 (2d Cir. 2015) (citation omitted). However, we "are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). Moreover, we may consider documents that are attached to the complaint, incorporated by reference in the complaint, or

otherwise integral to the complaint.  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).  As relevant here, that includes the contract between Brill and KKR and the contract between Predictive Health and Accelmed, which underlie Red Mountain's claims for breach of contract and are attached as exhibits to the Declaration of Andrew L. Hurst (ECF Nos. 31-1, 31-2).

## DISCUSSION

## I.   Breach of Contract

Red Mountain's first claim is for breach of contract. Specifically, Red Mountain alleges that it was the third-party beneficiary of defendants' consulting contracts with KKR and Accelmed and that it may therefore recover for defendants' breaches of the provisions governing conflicts of interest and use of confidential information.  (FAC ¶¶ 101-05.)  Defendants argue that Red Mountain has no right to recover for any breach because it is not the direct intended third-party beneficiary of these provisions.  We agree.

### A.   Legal Framework

Under New York law,[2] non-parties to a contract may sue for breach of that contract only if they are the intended

---

[2]   With respect to the breach of contract claim, the underlying contracts specify that they are to be governed by New York law.  The parties also brief each of the remaining claims under New York law, which is sufficient to establish that they consent to have all their claims

direct beneficiary of the provision at issue and not merely an indirect or incidental beneficiary.  See Grunewald v. Metro. Museum of Art, 3 N.Y.S.3d 23, 25 (N.Y. App. Div. 2015) (citation omitted).  Thus, to state a claim, a purported third-party beneficiary has the burden to show: "(1) the existence of a valid and binding contract between other parties[;] (2) that the contract was intended for his benefit[;] and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost."  Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 336 (N.Y. 1983) (citations omitted).

The New York Court of Appeals has identified two avenues whereby a non-party may show that it was the intended direct beneficiary of a contract.  The first is "when the third party is the only one who could recover for the breach of contract," and the second is "when it is otherwise clear from the language of the contract that there was 'an intent to permit enforcement by the third party.'"  Dormitory Auth. Of the State of N.Y. v. Samson Constr. Co., 30 N.Y.3d 704, 710 (N.Y. 2018) (quoting Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 66 N.Y.2d 38, 45 (N.Y. 1985)).

---

governed by New York law.  See Arch Ins. Co. v. Precision Stone, Inc., 584 F.3d 33, 39 (2d Cir. 2009).

Moreover, as with all breach of contract claims, the third-party beneficiary must also "allege the provisions of the contract upon which the claim is based . . . and the defendant's acts or omissions constituting the breach." Dilworth v. Goldberg, 914 F. Supp. 2d 433, 457–58 (S.D.N.Y. 2012) (citations and internal quotation marks omitted).

**B.    The Brill-KKR Contract**

We begin our analysis with the May 19, 2015 Consulting Agreement between Brill and KKR (the "Brill-KKR Contract" (ECF No. 31-1)).[3]

---

[3]     Red Mountain argues that it is premature to rule on its status as a third-party beneficiary under these contracts at the motion to dismiss stage because the contracts are ambiguous and that it therefore should be permitted to take discovery before dismissal. (Pl.'s Opp. Br. (ECF No. 33) at 17-22, & n. 4, 5.) Red Mountain offers two arguments in support of its claim that the contracts are facially ambiguous. Neither persuades.

First, Red Mountain states that it is not clear that the KKR contract or the Accelmed contract identified Red Mountain as the company that defendants were hired to evaluate. However, based on the reasonable inferences drawn from the Complaint, we accept as true for purposes of this motion to dismiss that the contracts designated Red Mountain as the company to be evaluated by defendants.

Second, Red Mountain argues that the KKR contract provides that KKR had to designate the "Target Company" for Brill to evaluate "in writing" and thus this writing could contain additional contractual commitments that Brill may have breached. This argument is equally unavailing. To start, there is nothing in the KKR contract that remotely suggests that KKR's written identification of a company for Brill to evaluate would contain additional terms regarding conflicts and confidentiality, especially when the contract itself specifically details Brill's contractual duties. Regardless, even if the writing contained additional terms, Red Mountain is making the untenable argument that it has standing as a third-party beneficiary to sue for breach of some contractual provision that it was not even aware of until this litigation. Accordingly, we find that it is appropriate to consider the contracts attached to the Hurst Declaration at this stage.

As a general matter, the Brill-KKR Contract broadly states that the purpose of Brill's engagement is to assist KKR with the

> review and analysis of the gastroenterology field (the "Project") concerning a potential investment by [KKR] in companies in such industry as identified by KKR in writing from time to time (such identified company, together with its affiliates, a "Target Company"). The parties may agree to designate one or more other companies as a Target Company hereunder from time to time.

(Brill-KKR Contract § 1.)  While there is no requirement that Red Mountain be specifically identified by name to be the third-party beneficiary, see <u>IBS Ketel, Ltd. v. Hanil Bank, Korea</u>, No. 98 Civ. 3507 (DC), 1999 WL 639696, at *2 (S.D.N.Y. Aug. 23, 1999), we accept as true for purposes of the motion to dismiss that Red Mountain was a Target Company designated by KKR.  However, both the language and scope of the Contract establish that Brill was working for the benefit of KKR and not its potential investment targets, including Red Mountain. Indeed, the Contract itself suggests that the services to be performed might be adverse to Red Mountain, as it contemplates Brill potentially helping KKR explore investment opportunities in the gastroenterology field besides Red Mountain.

The specific contractual provisions at issue do not upset this general dynamic between KKR, Brill, and Red Mountain or otherwise establish that the contracting parties intended that Red Mountain be a direct third-party beneficiary with a right to enforce those provisions.

First, with respect to conflicts of interest, Brill committed to perform his services for KKR "in a professional, workman-like manner in accordance with the directions of KKR." (Brill-KKR Contract § 4(a).) Brill also promised not to advise other companies that might look at investing in a Target Company that KKR was evaluating for potential investment for six months after termination of the Brill-KKR Contract. (Id. § 4(c).) Brill further agreed that he would not accept any engagements on behalf of other clients that

> would reasonably be expected to (i) give rise to a conflict of interest in respect of [his] services for KKR or (ii) result in the release of trade secrets or other proprietary or confidential information relating to the Project or KKR[.]

(Id. § 4(b).) KKR retained the sole right to waive any such conflicts that might arise. (Id.)

Whether or not Brill in fact breached these conflict-of-interest provisions, they are intended to benefit KKR and KKR alone. The Contract not only specified that Brill's work was to be performed for KKR and that Brill could not advise

KKR's competitors about similar potential investment opportunities, it also provided that KKR was the sole party that could waive enforcement of any conflict that could arise. There is thus no indication that Red Mountain was a direct intended beneficiary of these provisions or that Red Mountain, as opposed to KKR, would have the right to sue for their breach.  Accordingly, Red Mountain is no more than an incidental beneficiary, if that, with no standing to recover for breach of these provisions.

Second, regarding use of confidential information, Section 6 of the Brill-KKR Contract permitted Brill to use any "confidential, proprietary or non-public information" about the "Target Company and KKR" solely to assist KKR with evaluating potential investment targets.  (Id. §§ 1, 6(a)-(b).)  Brill also agreed to maintain the confidentiality of "any information regarding securities or other transactions by KKR or the consideration by KKR of any transaction or investment idea that [Brill] may learn in the course of the Project" and not to use any confidential information he obtained for his "personal benefit."  (Id. § 6(a).)  KKR was again designated as the sole entity that could waive these confidentiality provisions (see id. §§ 6(a)(i)-(iv)) or sue to force Brill's specific performance of those duties (id. § 11).  Moreover, the Contract stated that "any rights or

obligations contained or referenced in a writing addressed to the Target Company binding [Brill] to the confidentiality provisions of an undertaking of confidentiality entered into between KKR and the Target Company will be in addition to, and not in replacement of, the rights and obligations contained herein."  (Id. § 6(g).)[4]

While Red Mountain argues that it was the intended third-party beneficiary of these provisions because it was "the only party with reasonably certain and foreseeable damages from . . . misuse" of confidential information (Pl.'s Opp. Br. at 20), we disagree.  To start, it is evident from the Contract that KKR had a direct interest in preventing Brill from sharing confidential or proprietary information about KKR's potential targets with competing investors.  Without this protection, KKR might have to compete with other financiers to secure the investment.  Additionally, KKR would stand to lose value on its investment if the target company's proprietary information became public and it lost a competitive advantage.  This is consistent with KKR's retention of the sole ability to waive and enforce the confidentiality provisions in the Contract.  There is no basis

---

[4]    Notably, the Complaint does not allege that there was any such additional "writing addressed to [Red Mountain]" that contemplated further confidentiality "rights or obligations" that Brill might owe to Red Mountain, as contemplated by this language.

in the text or context of the Brill-KKR Contract to conclude that KKR intended to share those rights with Red Mountain or to confer those rights to Red Mountain.

As it is plainly evident that KKR is the intended direct beneficiary of these contractual provisions and the only party who could sue to enforce them, Red Mountain has no standing as a third-party beneficiary to sue for breach of these provisions.

### C.   The Predictive-Accelmed Contract

We next turn to the November 16, 2016 Consulting Agreement between Predictive Health and Accelmed (the "Predictive-Accelmed Contract" (ECF No. 31-2)).

The stated purpose of the Contract was to hire Predictive Health to "consult[] on health care reimbursement trends and strategy, [make] recommendations regarding potential interventions, the impact of coding, coverage policies and payment rates on practices and providers, and [provide] other services as mutually agreed by [Accelmed] and [Predictive Health]" in connection with Accelmed's potential investment in Red Mountain.  (Id. § 1, Ex. A.)  As above, the Contract is between an investment company and its consultant whereas Red Mountain is the target on the other side of a potential financing deal.  This dynamic, again, suggests as a general matter that Red Mountain's and Accelmed's interests are not

necessarily aligned and that Accelmed's consultant would therefore be working for Accelmed's benefit, not Red Mountain's.

Starting with the conflict-of-interest clauses of the Predictive-Accelmed Contract, Predictive Health warranted that it had "no outstanding agreement or obligation that is in conflict with any of the provisions of this Agreement or that would preclude [it] from complying with the provisions of this Agreement." (Id. § 5.)  The Contract further provides that any breach of this provision would allow Accelmed to terminate the Contract immediately.  (Id. §§ 5, 7.B.)

Here, as with the Brill-KKR Contract, there is no language that would suggest that Red Mountain is the intended beneficiary of these provisions.  To the contrary, a reasonable reading of the Contract establishes that Accelmed is the sole beneficiary of those provisions, as they are concerned with Predictive Health's ability to perform its consulting duties for Accelmed without conflict and any breach of the provision permits Accelmed to immediately dissolve the Contract without prior notice.  Because the Contract does not clearly identify Red Mountain as the intended third-party beneficiary of these provisions and because Accelmed has the authority to enforce those

provisions, Red Mountain is, at most, an incidental beneficiary and cannot sue for their breach.

With respect to the use of confidential information provision, the Contract states:

> [Accelmed] has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on [Accelmed's] part to maintain the confidentiality of such information and to use it only for certain limited purposes. [Predictive Health] agrees that, during the term of this Agreement and thereafter, [Predictive Health] owes [Accelmed] and such third parties a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out the Services for [Accelmed] consistent with [Accelmed's] agreement with such third party.

(Id. § 3.D.)

Construing this language in the light most favorable to Red Mountain, the Contract can be reasonably interpreted as creating the following duties that Predictive Health owed to Red Mountain: (1) not to disclose Red Mountain's confidential information to third parties; and (2) not to use Red Mountain's confidential information except as necessary to provide advice to Accelmed consistent with Accelmed's agreement with Red Mountain to "maintain the confidentiality of such information and to use it only for certain limited

purposes." Red Mountain does not allege that it delineated the "certain limited purposes" for which Accelmed could use Red Mountain's confidential information, but the reasonable inference from the Complaint is that Accelmed was obligated to maintain the confidentiality of Red Mountain's information and could not use that information for purposes other than conducting due diligence of Red Mountain.

While the Contract reasonably implies that Predictive Health owed Red Mountain duties as an intended third-party beneficiary, Red Mountain has not alleged facts establishing a breach of those duties. There is, for example, no allegation that Predictive Health ever disclosed Red Mountain's information to the Competitors or any other third party. Nor is there any allegation that Predictive Health used the information outside of the due diligence process.

Rather, Red Mountain alleges that Predictive Health "misus[ed] any information obtained from or about Red Mountain . . . for their own benefit or for the benefit of the Competitors" by providing a dishonest assessment of that information to Accelmed. (FAC ¶ 105; see id. ¶¶ 84-86.) In other words, Red Mountain alleges that Predictive Health assessed Red Mountain's confidential information as part of the due diligence process and then misled Accelmed in bad faith to dissuade it from investing in Red Mountain. Although

furnishing advice in bad faith may have been a breach of Predictive Health's duties owed to <u>Accelmed</u> under the Contract, there is no basis to conclude that Predictive Health's duty to furnish a sound, accurate, and professional assessment about an investment target was owed to any party besides Accelmed.  Because the beneficiary of the <u>consulting advice</u> portions of the Contract is unquestionably Accelmed and because Accelmed would have standing to sue for breach of those provisions, Red Mountain has no standing to recover for their breach as a third-party beneficiary.

Accordingly, because Red Mountain does not allege facts establishing that Predictive Health breached any duty owed to Red Mountain under the Contract, it does not state a claim for breach of contract.

## II.  **Actual and Constructive Fraud**

Red Mountain next claims that defendants are liable for actual and constructive fraud because they (1) misrepresented to KKR and Accelmed that they did not have a conflict of interest with Red Mountain (<u>see</u> FAC ¶¶ 51, 56, 64-67, 69-72, 84, 111-13, 115, 118-21), and (2) misrepresented to KKR and Accelmed that Red Mountain employed improper medical billing practices (<u>see</u> <u>id.</u> ¶¶ 73-82, 85-86, 114-15, 121).

Defendants argue that Red Mountain fails to allege the requisite confidential or fiduciary relationship between the

parties to support constructive fraud and does not adequately plead the elements necessary to state a claim of actual fraud premised on misrepresentations made to third parties.  While we agree that Red Mountain has not stated a claim for constructive fraud or a claim for actual fraud based on alleged misrepresentations about Red Mountain's billing practices, we find that the Complaint does state a claim of actual fraud for Brill's alleged misrepresentation about not having a conflict of interest with respect to the KKR deal.

### A.   Legal Framework

Under New York law, to state a claim for actual fraud plaintiffs must allege: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff."  Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006) (citation omitted).

The elements underlying a claim of constructive fraud are the same, "except that the element of scienter is replaced by a fiduciary or confidential relationship between the parties."  Tutor Perini Bldg. Corp. v. New York City Reg'l Ctr., LLC, No. 20 Civ. 731 (PAE), 2021 WL 965909, at *23 (S.D.N.Y. Mar. 15, 2021) (citations and internal quotation marks omitted).

### B.   Constructive Fraud

We begin with defendants' argument that Red Mountain has failed to allege a fiduciary or confidential relationship between defendants and Red Mountain to state a claim for constructive fraud.

Here, Red Mountain neither alleges nor argues that it shared a direct fiduciary or confidential relationship with defendants.  Rather, it submits that defendants must have owed it duties because of their superior knowledge of Brill's conflicts and the nature of their consulting relationships with KKR and Accelmed.

In essence, Red Mountain's theory is that even though it dealt with KKR and Accelmed at arm's length as a counterparty to a potential investment contract, KKR's and Accelmed's relationship with defendants——their consultants——can somehow be imputed to Red Mountain across that transactional divide. Putting aside the myriad issues that this theory would create for law firms, consultants, or any other advisors to parties in commercial transactions, Red Mountain cites to no authority that recognizes liability for constructive fraud under such circumstances.[5]  Indeed, it is well-established

---

[5]    The single case that Red Mountain cites in an attempt to vindicate this theory is <u>Ostano Commerzanstalt v. Telewide Sys., Inc.</u>, 794 F.2d 763, 765-66 (2d Cir. 1986), which never discusses constructive fraud or confidential and fiduciary relationships, but merely states the proposition that defendants may be liable for fraud to third parties when

that, as a general matter, "parties dealing at arm[']s length in a commercial transaction lack the requisite level of trust or confidence between them necessary to give rise to a fiduciary obligation, absent extraordinary circumstances." Henneberry v. Sumitomo Corp. of Am., 532 F. Supp. 2d 523, 550 (S.D.N.Y. 2007).  Thus, even assuming that KKR and Accelmed enjoyed a confidential or fiduciary relationship with defendants, it seems beyond cavil that no such relationship could be imputed from KKR and Accelmed to Red Mountain by virtue of their arm's-length dealings.  Accordingly, Red Mountain fails to establish the type of close relationship with defendants necessary to state a claim for constructive fraud under New York law.

### C. Actual Fraud

As previewed above, Red Mountain's actual fraud claims concern statements that defendants made to KKR and Accelmed about Brill's conflicts of interest and Red Mountain's billing practices.  Defendants attack these claims in two ways.  First, they argue that Red Mountain does not establish that defendants intended to use third parties KKR and Accelmed as conduits to make alleged misrepresentations to Red Mountain to induce its detrimental reliance.  And second,

---

they know that their misrepresentation would be communicated to those third parties.

they submit that the Complaint does not plead the details of the fraud with the requisite specificity under Federal Rule of Civil Procedure 9(b).

Under New York law, fraud claims based on statements made to third parties are only actionable when the defendant made the misrepresentation with the "intent that it be communicated to the plaintiff and that the plaintiff rely on it" and used the third party "as a conduit to relay the false statement to plaintiff, who then relied on the misrepresentation to his detriment." Pasternack v. Lab'y Corp. of Am. Holdings, 27 N.Y.3d 817, 827-29 (N.Y. 2016) (citations omitted).

Additionally, under Federal Rule of Civil Procedure 9(b), plaintiffs must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Thus, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004) (citation omitted). While Rule 9(b) further provides that elements of "[m]alice, intent, knowledge, and other conditions of a person's mind may be

alleged generally," Fed. R. Civ. P. 9(b), plaintiffs are nevertheless required to "allege facts that give rise to a strong inference of fraudulent intent," which, as relevant here, can be accomplished by pleading facts demonstrating that a defendant had the "motive and opportunity to commit fraud," Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006) (citations omitted).[6]

### 1.  Representations About Conflicts of Interest

We begin with the first category of alleged misrepresentations concerning Brill's conflicts of interest.

With respect to KKR, Red Mountain alleges that, in connection with executing the Brill-KKR Contract, Brill warranted to KKR that he did not have any conflicts of interest with Red Mountain even though he was presently working for the Competitors.  (FAC ¶¶ 64, 69-70.)  The Complaint further alleges that Brill made that misrepresentation to KKR with the intent that KKR communicate to Red Mountain that its consultant was not conflicted so that Red Mountain would agree to participate in the due diligence process and share its confidential information with Brill.  (Id. ¶¶ 66-67.)  Finally, the Complaint alleges that

---

[6]    While pleading "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness" is another avenue to establish a strong inference of scienter, see Lerner, 459 F.3d at 290-91, Red Mountain only argues that its scienter allegations satisfy the motive and opportunity test (see Pl.'s Opp. Br. at 22).

KKR confirmed to Red Mountain that its consultant did not have conflicts of interest and that Red Mountain would never have participated in the due diligence process and disclosed its confidential information absent such assurances.  (Id. ¶¶ 51, 65-66, 71.)  These allegations are sufficient to plead the circumstances of the fraud for purposes of Rule 9(b).[7]

With respect to Brill's intent, the Complaint presents a compelling inference of scienter via a motive and opportunity theory.  Regarding motive, Red Mountain alleges that Brill was helping the Competitors in what was effectively a zero-sum contest against Red Mountain to have their respective technologies designated as the official standard of care by the Guideline.  (See id. ¶¶ 8, 10, 16.)  As for opportunity, the Complaint asserts that Brill was provided a window to commit fraud and harm Red Mountain's chances to become the industry standard by virtue of his consulting contract with KKR to advise the firm on whether financing Red Mountain and its WATS3D technology would be a good investment.

---

[7]     Defendants argue that Red Mountain's allegations are insufficiently particularized because the Complaint "fails to identify the manner, time or place that [Red Mountain] purportedly learned of Dr. Brill's engagement with the Competitors."  (Defs.' Mot. at 16.)  In the context of this case, those specifics are immaterial because all that is required is for Red Mountain to plead the circumstances of the misrepresentation made by Brill to KKR, which was then passed on Red Mountain before Red Mountain permitted Brill to access its information. The circumstances under which Red Mountain discovered the falsity of Brill's representations to KKR are therefore irrelevant to a determination of the sufficiency of the pleading.

(See id. ¶¶ 16, 55, 64, 73.)   We find these allegations
sufficient to state Brill's intent to defraud Red Mountain by
using KKR as a conduit to relay misrepresentations about his
conflicts of interest to Red Mountain.[8]

Although   the   Complaint   provides   details   about   the
alleged fraud with respect to the KKR transaction, it is
lacking  in  that  regard  with  respect  to  the  Accelmed
transaction.   While  the  Complaint  alleges  that  Predictive
Health falsely certified to Accelmed that it had no conflicts
of interest, the Complaint does not offer any particularized
details  about  the  circumstances  under  which  that  alleged
misrepresentation was communicated to Red Mountain to induce
it to share its confidential information with defendants.[9]

---

[8]    Defendants argue that we should disregard Red Mountain's
allegations about defendants' conflict of interest and, presumably,
intent because the Complaint pleads "conspiratorial subterfuge" on
information and belief, which in most circumstances can only satisfy the
Rule 9(b) pleading standard when a complaint sets forth the factual basis
underlying its information and belief.   (Defs.' Mot. at 16-17 & n. 9
(citing DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242,
1247 (2d Cir. 1987)).)

   While the Complaint uses "conspiracy" as a colorful term to describe
what might have motivated Brill to make the alleged misrepresentations to
KKR about his conflict of interest, Red Mountain need not allege the
elements of a conspiracy to plead that Brill had a conflict of interest
with Red Mountain or that he had the requisite intent to commit the
alleged fraud.  The Complaint's factual allegations that Brill worked for
the Competitors during the relevant time period and that the Competitors
were directly pitted against Red Mountain in the race to establish their
respective technologies as the industry standard for detecting EAC (FAC
¶¶ 8, 10, 16, 81) are sufficient to allege a conflict of interest and
Brill's motive at the pleading stage.

[9]    Indeed, at oral argument, counsel for Red Mountain could not
identify where those particularized details were alleged in the Complaint
and further conceded that if Red Mountain could have pleaded those details
then it would have.

(See id. ¶¶ 83-87.)   Thus, in contrast to the allegations
that Red Mountain agreed to participate in due diligence with
KKR only because it received assurances that Brill was not
conflicted, there are no such allegations here.   Accordingly,
we find that Red Mountain fails to state a claim for fraud
for the alleged misrepresentations made by Brill to Accelmed
about his conflict of interest.

### 2.   Representations About Red Mountain's Overbilling

We next consider Red Mountain's allegations that
defendants "made false representations to KKR and Accelmed
regarding Red Mountain's billing practices, including that
Red Mountain was using the wrong reimbursement codes."   (FAC
¶ 114.)   According to Red Mountain, defendants knew "that KKR
and Accelmed would rely on their misstatements and that this
reliance would result in KKR and Accelmed backing out of their
respective term sheets."   (Id.)   While these allegations
suggest that defendants intended to deceive KKR and Accelmed,
there is no basis to conclude that defendants made these
misrepresentations to KKR and Accelmed for the purpose of
deceiving Red Mountain.   Indeed, rather than being misled by
defendants' statements to KKR and Accelmed about its billing
practices, Red Mountain alleges that it actively resisted
these representations and attempted to correct them by hiring

its own experts to opine on the validity of its coding
practices.  (See id. ¶¶ 54, 57-58, 80.)

As Red Mountain's deception and detrimental reliance are
necessary elements for it to state a claim for fraud, the
Complaint does not plead a viable fraud claim premised on
defendants' alleged misrepresentations to KKR and Accelmed
about Red Mountain's billing practices.  See Pasternack, 27
N.Y.3d at 829 (holding that a plaintiff cannot state a claim
for fraud under New York law "based on the reliance of a third
party, rather than the plaintiff").

## III. Timeliness of Red Mountain's Tortious Interference Claims

We next turn to Red Mountain's claims of tortious
interference with prospective business relations and tortious
interference with contract, which were first filed in New
York Supreme Court on December 13, 2019.  (ECF No. 1.)
Defendants argue that these claims are barred by the
applicable statute of limitations.

Both tortious interference claims are subject to a
three-year statute of limitations under New York law.  N.Y.
C.P.L.R. § 214(4); see Bandler v. DeYonker, 101 N.Y.S.3d 847,
848 (N.Y. App. Div. 2019).  The statute of limitations for
tortious interference claims begins to accrue when the
alleged interference first caused plaintiff to sustain

damages, thereby establishing each of the tort's elements. Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94 (N.Y. 1993); Thome v. Alexander & Louisa Calder Found., 890 N.Y.S.2d 16, 30 (N.Y. App. Div. 2009). There is no "discovery rule" applicable to tortious interference claims that would delay the statute of limitations clock until plaintiff learns or should have learned of each element of its claim. See Kronos, 81 N.Y.2d at 94. Accordingly, to determine when the statute of limitations began accruing, we must determine when Red Mountain was first injured by defendants' alleged tortious acts.

The basis of Red Mountain's claim for tortious interference with prospective business advantage is that defendants wrongfully caused KKR and Accelmed to delay and abandon their contemplated investments in Red Mountain, which frustrated Red Mountain's ability to bring its WATS3D to market. (See FAC ¶¶ 2, 21-25, 28-31, 63, 80, 85-86, 124.) In other words, but for the alleged tortious interference, KKR would have closed the supposedly imminent financing transaction with Red Mountain by no later than December 2015 and Accelmed would not have walked away from the potential deal with Red Mountain in December 2016.[10] Thus, Red Mountain

---

[10]   See FAC ¶ 80 ("[O]n December 14, 2015, KKR informed Red Mountain that, were it not for the 'concerns' raised by their reimbursement consultants, the KKR-Red Mountain deal would have closed

alleges that defendants' actions foiled its ability to secure financing and delayed the commercial launch of the WATS3D technology by potentially up to two years.   (See id. ¶¶ 2, 30, 63, 73, 80, 99.)

Red Mountain's tortious interference with contract claims are likewise premised on the theory that defendants induced KKR and Accelmed into breaching the confidentiality and use-of-information provisions in the term sheets by allowing Red Mountain's information to be used adversely against Red Mountain and not for the benefit of KKR or Accelmed.[11]   (Id. ¶ 131.)   Reasonably construed, these allegations refer to defendants using Red Mountain's confidential information to discourage KKR and Accelmed from closing financing deals with Red Mountain.

Although Red Mountain alleges that defendants' actions interfered with the KKR and Accelmed deals no later than December 2015 and December 2016, respectively, Red Mountain argues that the three-year statute of limitations bar does not apply to its tortious interference claims, which were

---

months earlier."); id. ¶ 86 ("Accelmed opted not to go through with the Red Mountain deal" in December 2016).

[11]   Red Mountain also alleges that it was injured by having its confidential information provided to a competitor.  (FAC ¶ 131.)  However, Red Mountain does not allege any facts to support this conclusory claim, including what information was disclosed, what competitor the information was disclosed to, or when the disclosure happened.

originally filed on December 13, 2019, because: (1) it was
not injured until Galen invested in the company in July 2017
and thus its claims did not begin accruing until that time;
and (2) the Court should apply the doctrines of equitable
tolling and equitable estoppel and declare Red Mountain's
claims timely.  Red Mountain, however, conceded at oral
argument that if the Court were to reject its arguments on
accrual and equitable tolling and estoppel, it had no date-
based argument that its claims were timely filed should we
determine that accrual began when the KKR and Accelmed deals
were first delayed in December 2015 and December 2016,
respectively.[12]

### A.    The Start of the Statute of Limitations Period

We first consider Red Mountain's argument that its
tortious interference claims did not accrue until July 2017,
when it ultimately entered into an inferior financing
arrangement with Galen.  In support, Red Mountain claims that
KKR never withdrew its term sheet and could have closed the
financing deal with Red Mountain at any time before the Galen
investment in July 2017, even though it informed Red Mountain
in December 2015 that it would have closed the deal months

---

[12]    Accordingly, while the Complaint does not allege the exact
date in December 2016 that "Accelmed opted not to go through with the Red
Mountain deal" (FAC ¶ 86), we understand that it must have been before
December 13 of that year based on this concession.

earlier but for the concerns raised by Brill.  Red Mountain
similarly submits that Accelmed could have re-issued its term
sheet and signed an investment deal with Red Mountain at any
point before July 2017, even though it told Red Mountain that
it was walking away from the deal in December 2016.  In other
words, Red Mountain contends that it could not have filed
suit before accepting the Galen financing deal and "having
some sense of whether or not it was damaged[.]"  (Pl.'s Opp.
Br. at 14.)

    That argument is inconsistent with when accrual begins
under New York law, as Red Mountain's alleged <u>injury</u> does not
hinge on when or whether it could find an alternative
financing arrangement.  Indeed, as explained above, the
injury alleged by Red Mountain is that defendants are
responsible for a nearly two-year delay in introducing the
WATS3D technology in the marketplace because they derailed
the financing deals with KKR and Accelmed.  As defendants'
tortious acts are allegedly the but for cause of those deals
falling through, then logically Red Mountain was first
injured at the moment that the deals <u>should have</u> gone through
absent defendants' interference.  For the KKR deal, that is
no later than December 2015 (when  KKR informed Red Mountain
the financing deal was delayed), and for the Accelmed deal,

that is December 2016 (when Accelmed informed Red Mountain it was walking away from the transaction).

While Red Mountain may not have known the <u>full extent</u> of the measure of damages it presents in the Complaint until July 2017, that does not change the fact that its injuries were first <u>sustained</u> by defendants' alleged interference as soon as the potential financing deals were delayed because of defendants' tortious acts.[13]  It was at that time that Red Mountain had a ripe cause of action to recover for any injuries caused by defendants' alleged tortious interference.  To illustrate this point, one need not look further than the counterfactual scenario in which Red Mountain never secured any financing deal with Galen:  Had Red Mountain never found an investor and gone bankrupt, it would still be able to allege cognizable claims for tortious interference with the KKR and Accelmed deals as soon as defendants' alleged tortious

---

[13]    <u>See</u> <u>Wallace v. Kato</u>, 549 U.S. 384, 391 (2007) (noting the well-recognized traditional rule that "tort cause[s] of action accrue[], and the statute of limitations commences to run, when the wrongful act or omission results in damages . . . even though the full extent of the injury is not then known or predictable") (citations omitted); <u>Johnson v. Nyack Hosp.</u>, 891 F. Supp. 155, 166 (S.D.N.Y. 1995), <u>aff'd</u>, 86 F.3d 8 (2d Cir. 1996) (recognizing that "subsequent injuries alleged are immaterial to the issue of timeliness") (citations omitted); <u>Greenwald v. City of New York</u>, No. 06 Civ. 2864, 2012 WL 6962297, at *8 (E.D.N.Y. July 19, 2012), <u>report and recommendation adopted</u>, No. 06 Civ. 2864, 2013 WL 354169 (E.D.N.Y. Jan. 29, 2013) ("New York law is clear that in the absence of an express exception by statute or prior Court of Appeals edict, statutes of limitations commence running upon commission of a wrong, irrespective of a plaintiff's ignorance of that wrong or its cause.") (citations omitted).

actions caused those transactions to be delayed or torpedoed when they otherwise would not have.

Accordingly, we find that the statute of limitations for Red Mountain's tortious interference claims had expired before Red Mountain filed its original complaint on December 13, 2019.

### B.   Equitable Tolling and Equitable Estoppel

Next, Red Mountain urges us to apply the doctrines of equitable tolling and equitable estoppel because it only "realized it had a tortious interference claim" when it "learned of Brill's undisclosed employment by competitors" in 2018.  (Pl.'s Opp. Br. at 15.)   In effect, Red Mountain is asking us to either graft the discovery rule onto New York's statute of limitations governing tortious interference claims or cast the statute of limitations aside altogether.

While New York law does not differentiate between the doctrines of equitable tolling (including fraudulent concealment) and equitable estoppel, Corp. Trade, Inc. v. Golf Channel, 563 F. App'x 841, 841–42 (2d Cir. 2014) (summary order) (citation omitted), equitable relief from the statute of limitations is available only "where the defendant conceals from the plaintiff the fact that he has a cause of action [or] where the plaintiff is aware of his cause of action, but the defendant induces him to forego suit until

after the period of limitations has expired," <u>Pearl v. City of Long Beach</u>, 296 F.3d 76, 82 (2d Cir. 2002) (citation omitted).

The relief afforded under these doctrines is accordingly considered to be an "extraordinary remedy," <u>E. Midtown Plaza Hous. Co. v. City of New York</u>, 218 A.D.2d 628, 628 (N.Y. App. Div. 1995) (citations omitted), and is appropriate "only in rare circumstances when the defendant's fraudulent conduct either conceals the existence of a cause of action or acts to delay Plaintiff from commencing a lawsuit," <u>Statler v. Dell, Inc.</u>, 841 F. Supp. 2d 642, 647 (E.D.N.Y. 2012) (citations omitted).  Moreover, a plaintiff seeking to invoke these doctrines "must establish that subsequent and specific actions were taken by defendants, separate from those that provide the factual basis for the underlying cause of action, and that these subsequent actions by defendants somehow kept [plaintiff] from timely bringing suit." <u>De Sole v. Knoedler Gallery, LLC</u>, 137 F. Supp. 3d 387, 423-24 (S.D.N.Y. 2015) (citations, internal quotation marks, and alterations omitted); <u>see</u> <u>Corp. Trade, Inc.</u>, 563 F. App'x at 842 (noting that the "act of concealment underlying the estoppel claim" cannot be "the same act which forms the basis of plaintiff's underlying substantive cause of action") (citations omitted).

As an initial matter, Red Mountain does not identify any wrongful conduct by defendants separate from or subsequent to the acts underlying the causes of action in the Complaint that prevented it from timely filing this case or identify any exception to that rule.  This alone is sufficient to deny the requested equitable relief.

Moreover, and equally dispositive, Red Mountain cannot establish as a factual matter that it could not have "timely br[ought] suit," Zumpano v. Quinn, 6 N.Y.3d 666, 674, (N.Y. 2006), or that it otherwise commenced this action "within a reasonable time after the facts giving rise to the estoppel have ceased to be operational," Doe v. Holy See (State of Vatican City), 793 N.Y.S.2d 565, 569 (N.Y. App. Div. 2005) (citations omitted).

Here, as Red Mountain acknowledges, it discovered that defendants had been working for the Competitors at some point in 2018 (FAC ¶¶ 81, 86, 96), but waited until December 2019 to file this lawsuit (ECF No. 1).  According to this timeline, Red Mountain was aware of the tortious interference with the potential Accelmed investment for, at a minimum, approximately **one year** before the statute of limitations expired in December 2019 yet decided to allow the limitations period to expire before commencing this action.  Because Red Mountain cannot point to any action by defendants that

prevented it from timely filing a complaint, it is not entitled to the extraordinary relief from the statute of limitations that it seeks. See Holy See, 793 N.Y.S.2d at 569 (holding that a plaintiff is not entitled to relief when it fails to "articulate[] any acts by defendants that prevented" or "wrongfully induced" plaintiff from "timely commencing suit").[14]

With respect to the tortious interference with the potential KKR transaction, Red Mountain likewise sat on its rights for nearly **one year** after its claims had already expired before finally filing suit. Yet, Red Mountain offers no rationale or justification for this lengthy delay and does not identify any malfeasance by the defendants during that extended period of time that somehow prevented it from bringing suit. It is a fundamental maxim that "equity aids the vigilant." Mikulec v. United States, 705 F.2d 599, 602 (2d Cir. 1983) (citation omitted). Thus, those who seek to invoke the benefits of equitable treatment must themselves act diligently. See id.; Holy See, 793 N.Y.S.2d at 569

---

[14]    See also Malone v. Bayerische Hypo-Und Vereins Bank, No. 08 Civ. 7277 (PGG), 2010 WL 391826, at *8-11 (S.D.N.Y. Feb. 4, 2010), aff'd sub nom. Malone v. Bayerische Hypo-Und Vereinsbank, AG, 425 F. App'x 43 (2d Cir. 2011) ("Because [plaintiffs] were on notice of the alleged fraudulent misconduct long before the expiration of the applicable statutes of limitations . . . , they may not claim the benefits of equitable tolling under the doctrine of fraudulent concealment.") (citation omitted).

("[T]he burden is on the plaintiff to establish that the action was brought within a reasonable time after the facts giving rise to the estoppel have ceased to be operational.") (citations omitted).

Applying those principles here, it is our judgment that a sophisticated business entity like Red Mountain does not act with sufficient diligence to warrant this extraordinary equitable relief when it learns that it has a cause of action that recently expired, waits for almost another year to finally file suit, and offers no compelling reasons for the prolonged delay.  See, e.g., Tanz v. Kasakove, No. 08 Civ. 1462 (LAK), 2008 WL 2735973, at *1 (S.D.N.Y. July 7, 2008) (finding plaintiff not entitled to equitable estoppel when it offered no explanation for its failure to commence suit until over a year later).

In sum, we find that Red Mountain's tortious interference claims are barred by New York's three-year statute of limitations.[15]

---

[15]    Red Mountain argues that it is premature to dismiss its tortious interference claims on statute of limitations grounds, as it is entitled to discovery on the equitable doctrines it seeks to invoke. However, it is appropriate to reject a claim for equitable estoppel or equitable tolling and grant a motion to dismiss on statute of limitations grounds when, as here, plaintiff does not present facts at the motion to dismiss stage that would entitle it to the relief it seeks. Corp. Trade, 563 F. App'x at 841-42 (affirming district court's dismissal of complaint on statute of limitations grounds because plaintiff did not identify any actions by defendant separate from those underlying the cause of action that prevented it from filing a timely complaint).

## IV.   **Unfair Competition**

We finally address Red Mountain's claim for unfair competition under New York law.  As the basis for this claim, Red Mountain alleges that defendants "obtained confidential and proprietary information regarding Red Mountain and its business" and then "wrongfully misappropriated, retained, shared, and used that information for the commercial advantage of the Competitors" by "exploiting [it] in a scheme to deprive Red Mountain of obtaining acceptance by the Standard of Practice Guidelines before the Competitors did." (FAC ¶¶ 138-40.)

New York has "long recognized two theories of common-law unfair competition: palming off and misappropriation." ITC Ltd. v. Punchgini, Inc., 9 N.Y.3d 467, 476 (N.Y. 2007) (citation omitted). "Palming off" is selling "the goods of one manufacturer as those of another," while misappropriation "usually concerns the taking and use of the plaintiff's property to compete against the plaintiffs own use of the same property."  Id. at 476, 478 (citations omitted).  Red Mountain's allegations do not fit either theory.

---

Additionally, because we find that the tortious interference claims are time barred, we do not reach the parties' other arguments in support of defendants' motion to dismiss these claims.

First, there is no allegation that defendants sold goods by passing them off as Red Mountain's. Accordingly, liability would have to rest on a theory of misappropriation.

The misappropriation theory of unfair competition traces its lineage to the Supreme Court's decision in <u>International News Service v. Associated Press</u>, 248 U.S. 215 (1918). <u>See</u> <u>Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.</u>, 672 F.2d 1095, 1105 (2d Cir. 1982); <u>ITC</u>, 9 N.Y.3d at 477. In <u>International News</u>, the Supreme Court recognized that in addition to "palming off" where a defendant "sell[s] its own goods as those of [plaintiff]," unfair competition covers the "substitute[]" circumstance where "misappropriation [takes] the place of misrepresentation" and the defendant "sells [plaintiff's] goods as his own." 248 U.S. at 242. While courts have noted that the misappropriation theory of unfair competition is "broad and flexible," it is nevertheless limited to instances where a defendant took "the skill, expenditures and labors" of plaintiff in bad faith and employed it for "its own commercial advantage." <u>Roy Export Co.</u>, 672 F.2d at 1105 (citations and internal quotation marks omitted); <u>see</u> <u>ITC</u>, 9 N.Y.3d at 478.

<u>International News Service</u> provides an illustrative example of unfair competition by misappropriation. There,

the Supreme Court upheld an injunction that prevented the International News Service from copying a news bulletin compiled by the Associated Press and then selling the pirated information to compete with the Associated Press's own sales of the bulletin.  In describing how this conduct fit the tort, the Supreme Court observed that the International News Service took the bulletin, which was the result of the Associated Press's "labor, skill, and money, and which is salable by [the Associated Press]", and then "endeavor[ed] to reap where it has not sown" by selling the bulletin as its own to newspapers in direct competition with the Associated Press.  Int'l News Serv., 248 U.S. at 239–40.

Other more modern illustrations of the misappropriation theory include when a defendant takes a plaintiff's customer list and uses it to divert business away from plaintiff and to defendant, see Milton Abeles, Inc. v. Farmers Pride, Inc., 603 F. Supp. 2d 500, 502-03 (E.D.N.Y. 2009), or when a defendant obtains access to a plaintiff's proprietary technology for a mobile ticketing platform as part of a potential partnership effort to win bids from mass transit agencies and then uses that proprietary information to submit its own bid while freezing plaintiff out of the transaction, see Bytemark, Inc. v. Xerox Corp., 342 F. Supp. 3d 496, 504, 510 (S.D.N.Y. 2018).  Likewise, Macy's Inc. v. Martha Stewart

Living Omnimedia, Inc., 127 A.D.3d 48, 56-57 (N.Y. App. Div. 2015), which Red Mountain identified in oral argument as the case most helpful to its unfair competition claims, involved J.C. Penney's efforts to induce the Martha Stewart brand to breach its exclusive contract with Macy's and then sell Martha Stewart's products at J.C. Penney department stores in direct competition with Macy's sales of those products, thereby misappropriating for itself the valuable commercial advantage Macy's had secured through its exclusivity deal with the Martha Stewart brand.

Red Mountain's theory of unfair competition does not fit within the misappropriation framework established by these cases. While Red Mountain alleges that defendants gained access to Red Mountain's confidential information and then made misrepresentations about that information to dissuade their clients from investing in Red Mountain (see FAC ¶¶ 2, 140), this fact pattern is more descriptive of a claim for tortious interference with prospective business advantage than one of unfair competition through misappropriation. See Ruder & Finn Inc. v. Seaboard Sur. Co., 52 N.Y.2d 663, 671 (N.Y. 1981) (cautioning that "commercial unfairness" does not necessarily equate with the tort of "unfair competition"). There is, for instance, no allegation that defendants copied the WATS3D technology and began selling it themselves to

medical providers in direct competition with Red Mountain. Nor is there any allegation that defendants usurped an exclusive corporate opportunity that belonged to Red Mountain by taking it for themselves, as in <u>Macy's</u>. As Red Mountain's theory of liability does not suggest that defendants "reap[ed] where [they] ha[ve] not sown" by taking Red Mountain's information or property and then employing it to compete with Red Mountain in the marketplace, Red Mountain fails to state a claim for unfair competition through misappropriation under New York law. <u>Roy Export Co.</u>, 672 F.2d at 1105 (citation omitted).

<b><u>CONCLUSION</u></b>

For the reasons stated above, the Court grants defendants' motion to dismiss Red Mountain's claims for breach of contract, tortious interference with prospective business advantage, tortious interference with contract, and unfair competition. The Court also grants defendants' motion to dismiss as it applies to Red Mountain's claims for fraud arising from defendants' alleged misrepresentations about Red Mountain's billing practices and defendants' alleged misrepresentation to Accelmed about having no conflict of

interest with Red Mountain.  Each of those claims is dismissed with prejudice.[16]

Defendants' motion to dismiss is denied as it relates to Red Mountain's fraud claim concerning Brill's alleged misrepresentation about having no conflict of interest with Red Mountain in the context of the KKR deal.

The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 29.

**SO ORDERED.**

Dated:      New York, New York
            September 27, 2021

                                        _____
                                        NAOMI REICE BUCHWALD
                                        UNITED STATES DISTRICT JUDGE

---

[16]    "Although federal courts are inclined to grant leave to amend following a dismissal order," a district court does not abuse its discretion if it dismisses a claim with prejudice where, as here, "leave to amend has not been sought." Chen v. Antel Commc'ns, LLC, 653 F. App'x 43, 44 (2d Cir. 2016) (summary order).  Red Mountain has not requested leave to amend.  Moreover, it has already repleaded its claims once after the Court afforded it the opportunity to cure the defects in its original complaint identified by defendants' letter requesting a pre-motion conference in anticipation of filing a motion to dismiss.  Accordingly, we dismiss these claims with prejudice.  See Bardwil Indus. Inc. v. Kennedy, No. 19 Civ. 8211 (NRB), 2020 WL 5633159, at *3 (S.D.N.Y. Sept. 21, 2020) (citations omitted).